Ginger L. Utley, 11788
Mitchell S. Maio, 11711
LEAR & LEAR P.L.L.C.
808 East South Temple Street
Salt Lake City, Utah 84102
Telephone 801.538.5000
ginger.utley@learlaw.com
mitch.maio@learlaw.com

*Attorneys for Plaintiffs*

## UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF UTAH

| | |
|---|---|
| UTAH ONLINE SCHOOL, a governmental entity; and WASHINGTON COUNTY SCHOOL DISTRICT, a governmental entity, <br><br> Plaintiffs <br><br> v. <br><br> FUEL EDUCATION, LLC, a Delaware limited liability company; and K12, Inc., a Delaware corporation; <br><br> Defendants. | Civ. No.: <br><br><br> Honorable <br><br> Jury Demanded |

Plaintiffs, Utah Online School (**"UOS"**) and Washington County School District (the **"District"**) (together, **"Plaintiffs"**), by and through their counsel of record, complain against the above-named Defendants Fuel Education, LLC (**"FuelEd"**) and K12, Inc. (**"K12"**) and state as follows:

## PARTIES

1.      Utah Online School is a governmental entity with its principal place of business in Washington County, Utah.

2.      Washington County School District is a governmental entity with its principal place of business in Washington County, Utah.

3.      Upon information and belief, K12, Inc. is a Delaware corporation with its principal place of business in Herndon, Virginia.

4.      Upon information and belief, Fuel Education, LLC is a Delaware limited liability company with its principal place of business in Herndon, Virginia.  Upon information and belief, FuelEd is a wholly-owned subsidiary of K12.

## JURISDICTION AND VENUE

5.      This Court has jurisdiction of this matter pursuant to 28 U.S.C. § 1332, as there is diversity of citizenship, and the amount in controversy exceeds $75,000.

6.      Venue is proper pursuant to 30 U.S.C. § 1391(b)(2), as this is a "judicial district in which a substantial part of the events or omissions giving rise to the claim occurred."

## GENERAL ALLEGATIONS

*A.  The Parties*

7.      UOS is one of Utah's leading online public schools, offering online course content to public school children in grades kindergarten through eighth (**"K-8"**) and ninth through twelfth (**"High School"**).

8.      UOS is a governmental entity within Washington County School District.

9.      UOS serves public school children throughout Utah.

10.  UOS is funded with taxpayer dollars, and it receives those monies based on the number of students enrolled with UOS.

11.  Upon information and belief, FuelEd is a wholly-owned subsidiary of K12.

12.  FuelEd contracts with online public schools like UOS to provide online curriculum/course content and hosting services for online course delivery.

13.  K12 owns and operates numerous online schools throughout the country, including Utah Virtual Academy (**"UTVA"**).

14.  Upon information and belief, UTVA is a Utah public charter school that is also funded with taxpayer dollars.

15.  UTVA is UOS's chief competitor for online student enrollment in Utah.

16.  A visit to UTVA's home page—found at utva.k12.com—confirms it is "Powered by K12" and announces their partnership:  "Utah Virtual Academy (UTVA) and K12 ignite the minds of children like yours to bring learning and innate possibility alive."

### B.  The Agreement

17.  On or about July 1, 2016, UOS executed a contract with FuelEd (the **"2016 Contract"**) under which FuelEd agreed to provide online curriculum/course content and hosting services to Utah students who enrolled with UOS (**"Online Education Services"**).

18.  Under the 2016 Contract, FuelEd provided UOS with Online Education Services for K-8 public school students.

19.  Upon information and belief, K12 develops and owns the course content that was delivered to UOS's K-8 students under the 2016 Contract with FuelEd (**"K12 Course Content"**).

20.     Pursuant to the 2016 Contract, UOS paid for online courses piecemeal, meaning UOS paid for courses only if/when a student enrolled in a course.

21.     During the last year of the 2016 Contract in 2018-2019, UOS paid a total of $393,351 to FuelEd for K-8 online courses and materials.

22.     During the 2016 Contract as now, High School students comprise the vast majority of UOS's student enrollment, accounting for roughly 80-85% of total student enrollment.

23.     In 2018, UOS began searching for a provider of online course content that could (1) provide a standard, uniform curriculum to serve not only K-8 students (as was the case under the 2016 Contract) but also its robust number of High School students, and (2) do so at a price UOS could afford.

24.     As a result of its nearly year-long search, UOS decided to enter into a new contract with FuelEd.

25.     During the discussions leading up to the signing of the new contract (the **"Agreement"**), K12 assigned a three-person team of representatives to UOS (the **"K12 Team"**) to make representations about the products and services that would be provided by FuelEd under the terms of the Agreement and to assist UOS throughout the term of the Agreement.

26.     In or around December 2018, the K12 Team traveled to St. George, Utah to present to UOS.

27.     During that presentation and in the many communications that preceded and followed it, the K12 Team promised UOS that FuelEd would provide a high school enrollment

portal that would allow High School students to easily enroll with UOS and receive the K12 Course Content that UOS contracted for in the Agreement (**"High School Enrollment Portal"**).

28.    Had the K12 Team not made the above-noted representations to UOS regarding a High School Enrollment Portal, UOS would not have entered into the Agreement.

29.    On or about March 8, 2019, UOS executed the Agreement with FuelEd, entitled "First Amendment" to the 2016 Contract.

30.    The Agreement removed and replaced in their entirety the "Terms," "Period," "Description of Services and Products," and "Billing Terms" that were included in the 2016 Contract.

31.    The Agreement is the subject of this litigation.

32.    The Agreement was drafted solely by K12 and/or FuelEd.

33.    The Agreement was not reviewed by an attorney for UOS or the District.

34.    Pursuant to the Agreement, FuelEd agreed to provide Online Education Services, including K12 Course Content, to Utah students who enrolled with UOS in grades K-8 and High School.

35.    Unlike the 2016 Contract under which UOS paid only for courses in which students actually enrolled, the Agreement requires a flat fee for an estimated number of courses that UOS must pay for regardless of whether they are ever used by students.

36.    Pursuant to Section 3 of the Agreement, FuelEd agreed to provide and UOS agreed to purchase licenses for (1) up to 24,000 course enrollments[1] for UOS students in K-8

---

[1] A "course enrollment" is a single course that is offered to a UOS student.  A student may register for as few or as many courses as they wish.  In other words, a "course" is not equivalent to a "student."

year-long courses or in High School semester courses for the period of July 1, 2019 through June 30, 2020 for a flat fee of $696,000 to be invoiced on or around April 1, 2019; (2) up to 30,000 course enrollments for UOS students in K-8 year-long courses or High School semester courses for the period of July 1, 2020 through June 30, 2021 for a flat fee of $960,000 to be invoiced on or around April 1, 2020; and (3) up to 37,500 course enrollments for UOS students in K-8 year-long courses or High School semester courses for the period of July 1, 2021 through June 30, 2022 for a flat fee of $1,312,500 to be invoiced on or around April 1, 2021.

37.    Pursuant to Section 3 of the Agreement, each individual course enrollment over and above the limits set forth in Section 3 and described above would be at a cost of $29 each during years 2019-2020, $32 each during years 2020-2021, and $35 each during years 2021-2022.

38.    The total purchase price of the courses described in Section 3 is $2,968,500 (excluding the cost of any additional course enrollments as set forth in Paragraph 37, excluding materials, which are an additional charge).

39.    In Section 4 of the Agreement, the full description of products to be provided by FuelEd "includes content as described in the course catalog."

40.    In Section 5 of the Agreement, the full description of services to be provided by FuelEd is listed under three headings, "Instructional Services," "Hosting Solution," and "Professional Services."  A total of five sentences describe the services to be provided under all three headings.

41.    Section 5, "Hosting Solution" provides as follows:  "The set-up, configuration and hosting of the applicable courseware for the delivery of courses, solely for the provision of

educational services to its students in the Territory enrolled in Customers (sic) educational programs."

42.     Section 5 further provides that "[i]f Customer requests additional professional services outside the scope of those provided in Section 3 above, the Customer will be presented with an estimate of additional costs for Customers (sic) approval in advance of undertaking the requested change of scope."

43.     On page 5 of the Agreement, under the caption "FERPA and CONFIDENTIALTY" (the **"FERPA Provision"**), FuelEd agreed to "develop, implement, maintain and use appropriate administrative, technical or physical security measures to the full extent required by FERPA [the Family Educational Rights and Privacy Act] in order to maintain the confidentiality of 'education records' as that term is defined by FERPA."

44.     FERPA defines "education records" as "those records that are: (1) directly related to a student; and (2) maintained by an educational agency or institution, or by a party acting for the agency or institution."  *See* 34 CFR § 99.3.

45.     FERPA defines a "student" as follows: "Except as otherwise specifically provided in this part [student] means any individual who is or has been in attendance at an educational agency or institution and regarding whom the agency or institution maintains education records." *Id.*

46.     Exhibit A to the Agreement provides that UOS "may not rely on any other documents, proposals, statements, or representations by any sales or service representatives or other parties."

47.     Immediately after the Agreement was signed, FuelEd breached it in several material respects.

### C. FuelEd and K12's Predatory Scheme to Frustrate the Agreement, Deprive UOS of Student Enrollment, and Improperly Enrich Itself

#### 1.  K12's Improper Contact and Solicitation of Minor Students.

48.     Prior to entering the Agreement and during the term of the 2016 Contract, UOS notified FuelEd of improper contacts of UOS's minor students (**"Minor Students"**) by K12 representatives.

49.     More specifically, when a Minor Student began the registration process to enroll with UOS, K12's marketing team was notified and provided with the Minor Student's contact information.  Often, within minutes, a K12 representative contacted the Minor Student or her parent (**"Parent"**) and either sowed confusion or blatantly misrepresented their affiliation with UOS in order to induce students to register with UTVA rather than UOS.

50.     UOS discussed K12's improper contacts of Minor Students with FuelEd prior to entering the Agreement, and FuelEd assured UOS that all such contacts would cease.

51.     With that verbal agreement in hand, along with the promise of the High School Enrollment Portal, and the inclusion of the FERPA Provision, UOS executed the Agreement.

52.     After entering the Agreement, UOS provided FuelEd/K12 a list of UOS students to be uploaded into K12's database (**"UOS Student List"**), for the sole purpose of migrating UOS student information onto the new K12/FuelEd student portal.

53.     The UOS Student List contained the names, contact information, and private education information of approximately 10,000 Minor Students who were either already enrolled

with UOS, had begun the enrollment process with UOS, or were located within the "Territory" as defined the Agreement.

54.    As such, each name on the UOS Student List constitutes a "student" under FERPA and was therefore subject to the Agreement's FERPA Provision.

55.    Additionally, each Minor Student's information included on the UOS Student List constitutes an "education record" under FERPA and was therefore subject to the Agreement's FERPA Provision.

56.    UOS protects its UOS Student List as confidential and proprietary, and it is strictly controlled so that no other entity or person has a copy of it absent entering a contract that contains a confidentiality provision to protect the information.

57.    In order to service UOS's students and prospective students under the terms of the Agreement, K12 created a new enrollment portal located at K12.com.

58.    K12 was to use the UOS Student List solely to migrate all existing and prospective UOS students on the UOS Student List to the new enrollment portal—K12.com—without requiring existing students to re-enroll with UOS and to provide an easy way for new students to enroll with UOS.

59.    The K12.com portal was not the High School Enrollment Portal that was promised to UOS by the K12 Team (as discussed in paragraph 27, *supra* and subsection 2, *infra*).

60.    Prior to uploading the UOS Student List into the K12 database, UOS demanded and FuelEd and K12 made explicit promises to UOS that (1) Minor Students and Parents would not receive *any* communications from FuelEd/K12; and (2) that K12 would not compete with

UOS by marketing UTVA (or any other K12 competing service) to any Minor Student or Parent on the UOS Student List.

61.     FuelEd/K12 violated its agreement with UOS when it uploaded the UOS Student List into K12's database.

62.     First, the K12.com registration page itself was created to drive students away from UOS towards UTVA.  As noted by a UOS representative, "if you click on the 'Enroll Parent Portal' button on the top right [of K12.com] . . . only UTVA is listed."

63.     Second, following the database upload of the UOS Student List, K12 immediately sent marketing materials to everyone on the UOS Student List.

64.     Unbeknownst to anyone at the time, however, the UOS Student List contained errors. For example, the list included Sam Smith's name but provided the personal contact information for Susie Jones (these names are fictious and for illustrative purposes only).

65.     In violation of their explicit promise to UOS, K12 took the UOS Student List and immediately sent K12 marketing emails to every Minor Student on the list, flooding 10,000 homes with private education record information of other Minor Students.

66.     Parents were outraged, and UOS received numerous complaints about the improper sharing of private student information and education records.

67.     UOS was forced to apologize on behalf of K12.

68.     In response, on May 15, 2019, UOS notified FuelEd that it had violated FERPA by disclosing private education records of Minor Students.

69.     About this time, UOS demanded that a new site—different from K12.com—be created for its students to register with UOS.

70.     As a result, FuelEd created the IP address for UtahOnline.org, but that too was simply another avenue for K12 to gather information on UOS students for the purpose of marketing UTVA.

71.     On May 9, 2019, a UOS employee created a dummy account to register a student and test K12's new UtahOnline.org registration portal.  Two days after creating the account, she received an email from K12 with links directing her to complete her contact information.  In response, she recognized "this is a back door approach to contact and soliciting students."

72.     Indeed, even after the creation of UtahOnline.org by FuelEd, Minor Students and Parents received marketing calls from K12 wherein K12 representatives sowed confusion or blatantly misrepresented their affiliation with UOS.

73.     In response, on May 16, 2019, UOS contacted FuelEd as follows: "As per our [Agreement] and [Utah law], Student information can't be used for marketing."

74.     On or about May 16, 2019, UOS asked FuelEd whether UOS student records would continue to "generate leads" for K12, to which FuelEd responded, "Yes, the record will always be in the K12 system."

75.     On May 17, 2019, FuelEd assured UOS that it had created controls to ensure "no [Minor Student] contact data may be accessed by the K12 enrollment team."

76.     Despite these repeated promises by FuelEd, the improper, predatory contacts continued.

77.     On September 24, 2019, a Parent contacted UOS about a strange phone call she received after her son began the enrollment process with UOS.  The caller did not identify

himself but asked about the Minor Student's records.  The parent asked UOS: "Please inform me whether this [call] is [a] ligit (sic) UOS call or fraud."

78.     The call was made from a K12 telephone number.

79.     On September 25, 2019, another Parent contacted UOS asking why they received a call from K12:  "I just am hoping my sons (sic) info hasn't been leashed (sic) out somehow to who shouldnt (sic) have it."

80.     UOS immediately contacted K12:  A parent "is still being contacted again today by k12.  I called the number [that was used to contact the parent] and it is from k12.  Please have these phone calls stop."

81.     On September 27, 2019, UOS personnel created a dummy student enrollment account with UOS to again test whether K12 was continuing to improperly contact Minor Students.

82.     Less than ten minutes after creating the dummy account, the person who set up the account was contacted by K12's Family Support Call Center, identifying herself as a UOS representative.  The caller verified the information on the account and then discussed enrollment for UTVA.  When the person tried to clarify and asked the caller if she was calling from UOS or UTVA, the caller replied, "It's not giving me any talking points for this. . . . It's not giving me anything to talk about for Utah Online [School]."  After a brief hold, the caller apologized and ended the call.

83.     On that same day, September 27, 2019, UOS again notified FuelEd that it had received "confirmation that other families are being contacted by k12.  Why are our families being contacted by k12?  This was reported on Tuesday and still not fixed."

84.    On October 1, 2019, FuelEd contacted UOS and blamed the improper, predatory contact of Minor Students and Parents on a single employee who had failed to be properly trained:  "It seems we have a new enrollment agent that did not follow the appropriate workflow protocol . . . .  Please be assured that we will continue to address this issue until it is fixed, once and for all!"

85.    While a clear admission, this statement cannot be true since the improper contacts had been occurring for months.  Blaming a "new" agent who had only recently begun working for K12 is not plausible.

86.    UOS understood as much and responded the same day: "We still had a student get contacted today so if it was only one enrollment agent they would already be aware of the process and not to contact UOS students."

87.    On October 2, 2019, UOS again contacted FuelEd, questioning the improper tactics and their resulting loss of UOS student enrollment:  A parent "was contacted [by K12], and never finished enrollment with [UOS].  Where did she finish enrollment at?"

88.    UOS received no response from FuelEd regarding where the student actually enrolled.

89.    On October 14, 2019, FuelEd admitted to UOS in a written communication that they never had any controls or systems in place to prevent K12's improper contacts:  "I got [a response] from our enrollment director about your families still being contacted by K12. She has met with her supervisor and together, *they have determined that we need a systems fix for the problem. They* are *currently working on a plan* and getting the engineering team involved. Once I have more details I will let you know" (emphasis added).

90.    On October 14, 2019, UOS responded:   "I appreciate your reply and the words that say this will be corrected.  However, it has been more than a year of this same statement and K12 inc. continues to contact our students, confuse our parents and transfer students from our school to other schools."

91.    Upon information and belief, the improper contacts were made to serve FuelEd/K12's predatory business model of contracting, through FuelEd, with online public schools, charging a flat fee for an exorbitant number of licenses, and then using confidential Minor Student information and education records to market K12's competing service:  UTVA.

92.    Upon information and belief, K12 receives 100% of the revenue for each student who enrolls with UTVA.

93.    Given the flat fee pricing structure in the Agreement, FuelEd/K12 also collects the full Agreement price from UOS, whether UOS enrolls a single student or loses every one of them to UTVA.

94.    Upon information and belief, it is far more financially beneficial for K12 to sell students on UTVA (rather than UOS) because, in addition to receiving the full financial benefit of the Agreement,  K12 receives 100% of the revenue from UTVA student enrollment, and K12 requires UTVA students to purchase a minimum number of courses while UOS does not.

95.    Ultimately, UOS was forced to incur the burden and expense of setting up its own enrollment portal to prevent K12's improper contacts of UOS Minor Students and Parents.

96.    K12's improper contacts resulted in an unknown loss of students to UTVA as well as several students inadvertently enrolling with UTVA rather than UOS.

97.    UOS was contacted by several Parents of Minor Students requesting that their child be un-enrolled with UTVA and enrolled with UOS, which created yet another time consuming and costly administrative burden on UOS, a frustrating experience for Parents and Minor Students, and reputational damage to UOS.

98.    Some Parents expressed frustration at being duped or confused by K12 representatives into registering for UTVA after beginning the registration process with UOS. Because Utah Virtual Academy sounds confusingly similar to Utah Online School, the confusion is understandable and easy to capitalize on, as K12 has done.

### 2.   The High School Enrollment Portal Was Never Delivered.

99.    Despite the explicit promises made to UOS by the K12 Team, the High School Enrollment Portal was never created.

100.    After months of waiting and requesting it, in August 2019, K12 was still assuring UOS that it would provide a High School Enrollment Portal, and a month later, promised to provide UOS with "timelines for getting the H[igh] S[chool] Portal setup for you."

101.    In October 2019, a member of the K12 Team, Ms. Abboud, notified UOS that "we are still moving forward and working out the details and logistics of the [High School Enrollment] portal setup."

102.    Ms. Abboud also stated the High School Enrollment Portal should be ready by December 2019.

103.    The High School Enrollment Portal was never created.

104.    To date, UOS has been unable to enroll a single High School student in a K12 semester course due to the lack of a High School Enrollment Portal that would provide the functionality required by UOS.

105.    Instead, UOS has been forced to pay a separate third-party a total of $165,330 to provide course content for its large High School population, despite the fact that the chief reason UOS entered the Agreement for a price of nearly $3 million was to provide its High School students with K12 Course Content.

106.    On April 8, 2019, FuelEd notified UOS that despite paying $696,000 for 24,000 course enrollments, UOS has used a mere 3,417 course enrollments, serving only 908 students in grades K-8.

107.    Based on the individual pricing of courses set forth in the Agreement, if UOS paid for only the courses being used during 2019-2020, the total cost would be $99,093 ($29 x 3,417).

108.    If UOS calculated the individual cost of courses under the Agreement's flat fee pricing structure of $696,000, each course would cost $203.68 rather than the $29 set forth in the Agreement ($696,000/3,417).

### 3.    *UOS's Notice of Breach/Termination of the Agreement*

109.    Pursuant to the terms of the Agreement, "[e]ither party may terminate . . . at any time with ninety (90) days' prior written notice . . . for cause."

110.    The termination provision may be invoked if either party "fails to fulfill any representation, warranty, or material condition, term, provision, or obligation contained in th[e] Agreement and fails to cure within thirty (30) days' of such notice from the terminating party."

111.    On May 16, 2019, UOS first notified FuelEd that the District was terminating the Agreement based on the improper, predatory contacts of Minor Students and Parents by K12 and the lack of a High School Enrollment Portal.

112.    The District withheld its first payment of $696,000, but FuelEd pressured UOS, threatening to remove all UOS K-8 students and course content—leaving these students without a school—if payment was not received.

113.    Under duress, the District remitted a total of $939,903 to FuelEd under the Agreement for 2019-2020, inclusive of the cost of licenses for courses ($696,000) as well as the cost of materials.

114.    Because the breaches persisted and were not cured, on January 30, 2020, UOS again formally notified FuelEd/K12 of (1) its ongoing material breaches of the Agreement, and (2) UOS and the District's position that the Agreement was terminated for cause.

115.    On February 21, 2020, FuelEd/K12 responded that it has not breached the Agreement and refuses to consider it terminated.

116.    More specifically, in that February 21, 2020 correspondence, FuelEd/K12 (1) stated that its use of Minor Students' education records was permissible because the minor children attempting to enroll with UOS were "leads" rather than "students" within the meaning of FERPA; (2) blamed a lapse in "protocol" for K12's improper contacts of Minor Students; and (3) asserted that FuelEd/K12 never agreed to provide a High School Enrollment Portal.

**FIRST CAUSE OF ACTION**
**(Breach of Contract – Section 5, Hosting Solution)**

117.    Plaintiffs incorporate Paragraphs 1-115 as if fully set forth herein.

118.    Pursuant to the legally enforceable Agreement entered by the parties, a material breach exists where either party "fails to fulfill any representation, warranty, or material condition, term, provision, or obligation contained in th[e] Agreement."

119.    Section 5, Hosting Solution, is a material provision of the Agreement.

120.    Pursuant to Section 5, Hosting Solution, FuelEd agreed to provide the following: "The set-up, configuration and hosting of the applicable courseware for the delivery of courses, *solely for the provision of educational services to its students* in the Territory enrolled in Customers (sic) educational programs" (emphasis added).

121.    Plaintiffs performed their obligations under the Agreement by making payments under duress in the amount of $939,903 to date.

122.    FuelEd breached this provision by knowingly enabling K12 representatives to use UOS's Hosting Solution to generate leads for UTVA.

123.    FuelEd further breached this provision by knowingly allowing K12 representatives to use UOS's Hosting Solution to contact existing and potential UOS Minor Students and Parents during the student's registration process in an attempt to drive them away from registration with UOS and towards registration with K12's competing service, UTVA.

124.    FuelEd failed and/or was unable to institute appropriate protocols and measures to prevent K12 representatives from using UOS's Hosting Solution for these improper acts.

125.    By so doing, FuelEd failed to provide Hosting Solution "*solely* for the provision of education services to [UOS'] students" and used its Hosting Solution to give UTVA a competitive advantage over UOS (emphasis added).

126.    By these actions and failures, FuelEd materially breached the Agreement

127.    After receiving notice from Plaintiffs of the above breach, FuelEd failed to cure that breach within the time allotted by the Agreement.

128.    As a result of this breach, Plaintiffs have incurred damages insofar as they have paid the Agreement fee for the exclusive benefit of the Hosting Solution which UOS has not received.

129.    Additionally, Plaintiffs have been damaged insofar as FuelEd/K12's predatory recruiting efforts effectively influenced students to enroll with UTVA rather than UOS, since Plaintiffs are only reimbursed for actual UOS student enrollments.

130.    The Agreement is terminated.

**SECOND CAUSE OF ACTION**
**(Breach of Contract – FERPA and Confidentiality)**

131.    Plaintiffs incorporate Paragraphs 1-130 as if fully set forth herein.

132.    Pursuant to the legally enforceable Agreement entered by the parties, a material breach exists where either party "fails to fulfill any representation, warranty, or material condition, term, provision, or obligation contained in th[e] Agreement."

133.    The FERPA Provision is a material provision of the Agreement.

134.    Indeed, the FERPA Provision is vital to the Agreement because the use of student education information is tightly regulated not only by the Federal Education Rights and Privacy Act, *see* 20 U.S.C. § 1232 *et seq.*, but also by Utah law.  *See* Utah Code § 53E-9-309, *et seq.*

135.    Utah Code § 53E-9-309(2) requires that education entities contracting with a third party contractor, like FuelEd, have a provision in their contract creating "requirements and restrictions related to the collection, use, storage, or sharing of student data by the third-party

contractor that are necessary for the education entity to ensure compliance with the provision of this part and state board rule."

136.    Consequently, the FERPA Provision is material because it is a *sine qua non* for a contract like the Agreement in Utah.

137.    As mentioned above, UOS has performed its obligations under the Agreement by making the payments, under duress, to FuelEd/K12 in the amount of $939,903 to date.

138.    Pursuant to the FERPA Provision, "FuelEd agrees to develop, implement, maintain and use appropriate administrative, technical or physical security measures to the full extent required by FERPA in order to maintain the confidentiality of 'education records' as that term is defined by FERPA."

139.    FuelEd breached this provision by failing to "develop, implement, maintain and use appropriate administrative, technical or physical security measures" to ensure adequate protection of UOS students' education records.

140.    In fact, on October 14, 2019, FuelEd/K12 admitted they never had *any* such measures in place, stating that such measures had yet to be developed:  "Our enrollment director . . . ha[s] determined that we need a systems fix for the problem. They are currently working on a plan and getting the engineering team involved."

141.    FuelEd further breached the FERPA Provision by knowingly allowing K12 representatives to obtain, disclose, and use the education records of UOS students outside of allowable purposes—chiefly to market K12's competing service, UTVA.

142.    When UOS again notified FuelEd/K12 of this breach in January 2020, and in light of its prior admission that it had no proper measures in place, FuelEd/K12 next responded that its

use of Minor Students' education records was permissible because the minor children attempting to enroll with UOS were "leads" rather than "students" within the meaning of FERPA.

143.    However, the majority of the minor children on the UOS Student List were active UOS students at the time K12 used the education records provided to FuelEd/K12 via the Agreement to solicit their enrollment in K12's competing service, UTVA.  Thus, the Minor Students constitute "students" under FERPA.

144.    FuelEd's misuse of Minor Student information violates the strict conditions set forth in the Agreement.

145.    The UOS Student List is a confidential, proprietary document that is tightly controlled.  FuelEd/K12's misuse of the UOS Student List for the improper purpose of marketing K12's competing service, UTVA, constitutes a breach of the FERPA Provision.

146.    Based on the foregoing, FuelEd materially breached the Agreement.

147.    After receiving notice from UOS of the above breach, FuelEd failed to cure that breach within the time allotted by the Agreement.

148.    As a result of FuelEd's Breach, Plaintiffs have incurred damages insofar as Plaintiffs bargained and paid a premium for their students' information to be protected in accordance with state and federal law and yet was not provided that protection.

149.    Additionally, Plaintiffs have been damaged insofar as FuelEd/K12's predatory recruiting efforts effectively influenced students to enroll with UTVA rather than UOS, since Plaintiffs are only reimbursed for actual UOS student enrollments.

150.    Consequently, the Agreement is terminated.

## THIRD CAUSE OF ACTION
### (Breach of Contract—Warranty)

151.    Plaintiffs incorporate Paragraphs 1-148 as if fully set forth herein.

152.    Pursuant to the legally enforceable Agreement entered by the parties, a material breach exists where either party "fails to fulfill any representation, warranty, or material condition, term, provision, or obligation contained in th[e] Agreement" (**"Warranty Provision"**).

153.    The Warranty Provision is a material provision of the Agreement.

154.    Pursuant to the Warranty Provision, "FuelEd warrants that the services will be performed in a professional and workmanlike manner in accordance with commercially reasonable industry standards."

155.    Chief among the services to be performed under the Agreement was the delivery of a product and service that served UOS, its students, and potential students that would accommodate delivery of up to 24,000 courses in the first year of the Agreement.

156.    FuelEd/K12 breached the Warranty Provision by taking actions that deprived UOS of student enrollment.

157.    Also chief among the services to be performed under the Agreement was to deliver a product/service capable of enrolling UOS's large High School student population.

158.    FuelEd and the K12 Team made explicit representations that a High School Enrollment Portal was part of the service to be provided under the Agreement.

159.    But for these representations, UOS would not have entered the Agreement.

160.    Plaintiffs performed their obligations under the Agreement by making payments in the amount of $939,903 to date for the services described in the foregoing paragraphs.

161.    Instead of providing the promised High School Enrollment Portal in a "professional and workmanlike manner in accordance with commercially reasonable standards," Plaintiffs provided no portal at all, and instead provided Plaintiffs with empty promises of the portal's development.

162.    Thus, FuelEd/K12 breached the Warranty Provision by failing and refusing to provide the promised High School Enrollment Portal.

163.    FuelEd/K12 also breached the Warranty Provision by actively recruiting students trying to enroll with UOS for FuelEd/K12's own competing service, UTVA.

164.    FuelEd/K12 warranted that it would provide a "license of up to twenty-four thousand (24,000) enrollments" for UOS in the Agreement's first year in a "professional and workmanlike manner in accordance with commercially reasonable standards."    Instead, FuelEd/K12 used each attempt by a Minor Student to enroll with UOS as an opportunity to poach those students, ultimately frustrating the service that FuelEd/K12 warranted it would provide. Such behavior is neither "commercially reasonable" nor "professional and workmanlike."

165.    FuelEd/K12's predatory marketing behavior and improper sharing of student information sullied UOS's reputation among Minor Students and Parents.

166.    Indeed, after receiving numerous complaints from Parents of Minor Students, Plaintiffs ultimately had to apologize for FuelEd/K12's bad behavior.

167.    Based on the foregoing, FuelEd breached its warranty of providing services in a professional, workmanlike, and commercially reasonable manner and, as a consequence, FuelEd/K12, materially breached the Agreement.

168.    After receiving notice from UOS of the above breach, FuelEd failed to cure that breach within the time allotted by the Agreement.

169.    Plaintiffs have been harmed by this breach insofar as Plaintiffs have paid a premium price for services that have been rendered in a fashion that has stymied UOS student enrollment, sullied Plaintiffs' reputation, and required UOS administrative time and effort time to correct.

170.    Additionally, Plaintiffs have been damaged insofar as FuelEd/K12's predatory recruiting efforts effectively influenced students to enroll with UTVA instead of UOS, since Plaintiffs are only reimbursed for actual UOS enrollments.

171.    As a result of the foregoing, the Agreement is terminated.

**FOURTH CAUSE OF ACTION**
**(Breach of Contract)**

172.    Plaintiffs incorporate Paragraphs 1-171 as if fully set forth herein.

173.    Pursuant to the Agreement, a material breach exists where either party "fails to fulfill any representation, warranty, or material condition, term, provision, or obligation contained in th[e] Agreement."

174.    As demonstrated in the First Cause of Action above, FuelEd breached a material provision of the Agreement:  Section 5, Hosting Solution.

175.    As demonstrated in the Second Cause of Action above, FuelEd breached a material provision of the Agreement:  FERPA and CONFIDENTIALITY.

176.    As demonstrated in the Third Cause of Action above, FuelEd breached a material provision of the Agreement:  the Warranty Provision.

177.    Collectively, these breaches constitute a material breach of the Agreement.

178.    More specifically, in the event the breaches alleged in each of the first three Causes of Action do not individually constitute a material breach of the Agreement, collectively, they constitute a material breach of the Agreement because they frustrate the Agreement's purpose and deprive Plaintiffs of the benefit of their bargain.

179.    After receiving notice from UOS of the above breaches, FuelEd failed to cure the breaches within the time allotted by the Agreement.

180.    Plaintiffs have been damaged by these breaches as set forth in the First, Second, and Third Causes of Action.

181.    The Agreement is terminated.

**FIFTH CAUSE OF ACTION**
**(Breach of the Covenant of Good Faith and Fair Dealing)**

182.    Plaintiffs incorporate Paragraphs 1-181 as if fully set forth herein.

183.    It is well recognized in Utah that a covenant of good faith and fair dealing is an implied duty and inheres in every contractual relationship. *Travelers Property Casualty Co. of America v. Federal Recovery Services, Inc.*, 156 F.Supp.3d 1330, 1337 (D. Utah 2016).

184.    Under this implied covenant, "the contracting parties each impliedly promise not to intentionally or purposely do anything that will destroy or injure the other party's right to receive the fruits of the contract, and to comply with the covenant, a party must act consistently with the agreed common purpose and the justified expectations of the other party." *Id.* at 1337-38 (citation omitted).

185.    FuelEd and K12 breached this covenant by abusing the enrollment process it provided to UOS in order to acquire confidential Minor Student names, contact information, and

education records and using that information to generate "leads" to market and pursue its own competing UTVA program and product.

186. This breach was exasperated by the fact that the enrollment process FuelEd/K12 provided to UOS was designed with a period between the initiation of enrollment and the completion of enrollment during which FuelEd/K12 sought to poach UOS's prospective students.

187. FuelEd and K12 were aware that the District and UOS's funding is contingent upon actual enrollment. Nevertheless, FuelEd/K12 abused their contractual relationship with Plaintiffs and receipt of confidential information to actively "destroy and injure [Plaintiffs'] right to receive" enrollments through FuelEd/K12's services, which were the "fruits of the contract."

188. The foregoing scheme was not only unfair to Plaintiffs but was dishonest.

189. FuelEd and K12 also breached this covenant by drafting the Agreement in favor of themselves, including (1) vague and limited terms regarding the products and services to be delivered, and (2) a restrictive provision that prohibits UOS from relying on any representation that FuelEd/K12 chose not to memorialize in the Agreement.

190. FuelEd and K12 are sophisticated, repeat players in the online education realm while UOS is a group of educators who did not have an attorney review the Agreement before signing it and instead relied on the explicit, repeated representations made by FuelEd and K12 to induce UOS to sign the Agreement.

191. FuelEd and K12 capitalized on UOS's inexperience and breached its covenant of good faith and fair dealing by sending the K12 Team to meet with UOS and make explicit, repeated verbal representations regarding delivery of the High School Enrollment Portal prior to

the Agreement's execution, making repeated promises to UOS that the portal would be delivered after the Agreement's execution, and then failing and refusing to deliver such a portal by relying on a boilerplate clause, FuelEd/K12 inserted into the Agreement, stating that "[UOS] may not rely on any other documents, proposals, statements, or representation by any sales or service representatives or other parties, unless expressly contained herein."

192.    But for the representations made by the K12 Team regarding the High School Enrollment Portal, UOS would not have entered into the Agreement.

193.    By using the K12 Team to make false promises to induce UOS to execute the Agreement, FuelEd/K12 deployed a bait-and-switch tactic that injured and destroyed Plaintiffs' right to receive the benefits of its bargain—a customized High School Enrollment Portal—which was represented to Plaintiffs to be one of the fruits of the Agreement.

194.    Again, the behavior described above was not only unfair to Plaintiffs but was dishonest and demonstrates bad faith.

195.    FuelEd and K12 further breached the covenant of good faith and fair dealing by selling UOS on a flat-fee pricing structure rather than a piecemeal pricing structure as was included in the 2016 Contract for the purpose of ensuring that regardless of the number of students FuelEd/K12 drove from UOS into UTVA, they would still garner the benefit of the full Agreement price from UOS.

196.    By using the flat-fee pricing, FuelEd/K12 ensured that it could be paid for UOS's unobtained enrollments while profiting from students it poached for enrollment in its competing UTVA program.  This scheme was designed to frustrate UOS's ability to enroll students, which was part of the fruit of the Agreement. Unfortunately, the scheme succeeded, and Plaintiffs have

been harmed thereby in a manner that has been unfair to Plaintiffs and dishonest on the part of Defendants.

197.    FuelEd/K12 also breached the covenant of good faith and fair dealing by developing an enrollment portal for UOS located at K12.com that listed only UTVA as a possibility for enrollment.  This was done for the purpose of confusing UOS students and potential students, poaching the enrollment of such students and prospective students, and depriving UOS of student enrollment.

198.    When UOS demanded a new enrollment portal, K12 developed UtahOnline.org for UOS enrollment.  However, unbeknownst to UOS, that too was used by K12 to collect private student information and education records which were then sent to K12's marketing team.  This too was done for the purpose of depriving UOS of student enrollment.

199.    Since the acquisition of student enrollment by UOS for state reimbursement against the flat-fee it paid FuelEd/K12 was a cornerstone of the Agreement, frustrating UOS's enrollment is a clear breach of FuelEd/K12's covenant of good faith and fair dealing.

200.    This scheme to siphon student enrollments away from UOS and to UTVA was, quite simply, dishonest and done in bad faith.

201.    Plaintiffs have been harmed by FuelEd/K12's actions because the District has paid $939,903 for tens of thousands of licenses that Defendants have done their best to ensure are not used by interfering with enrollments as described above.

202.    Plaintiffs have also been harmed because they were induced to pay this exorbitant flat fee by false promises, which FuelEd/K12 now claims it has no obligation to fulfill.

## SIXTH CAUSE OF ACTION
### (Tortious Interference)

203.    Plaintiffs incorporate Paragraphs 1-202 as if fully set forth herein.

204.    Tortious interference exists where (1) the defendant intentionally interfered with the plaintiff's existing or potential economic relations, (2) by improper means, (3) causing injury to the plaintiff. *Nunes v. Rushton*, 299 F.Supp.3d 1216, 1236 (D. Utah 2018).

205.    FuelEd/K12 intentionally interfered with UOS's existing and potential economic relations by abusing its access to confidential Minor Student information and education records in order to drive students away from UOS and into enrollment with K12's own competing service, UTVA.

206.    FuelEd/K12's interference was achieved intentionally and by improper means, including by violating FERPA, Utah Code § 53E-9-309,  student confidentiality, the terms of the Agreement, and by FuelEd/K12's repeated promises to UOS that such improper marketing contacts to UOS's students and prospective students would cease.

207.    FuelEd/K12's intentional interference by improper means has caused injury to UOS in the form of lost student enrollment, the consequence of which is less funding for UOS and the District.

208.    FuelEd/K12's intentional interference by improper means has also caused reputational damage to UOS among students, prospective students, and their parents, necessitating the expenditure of time and effort by UOS and its employees to repair that reputational damage.

209.    FuelEd/K12 also intentionally interfered with UOS's existing and potential economic relations by verbally promising the delivery of a High School Enrollment Portal and failing to deliver such a portal.

210.    The string of false promises regarding the High School Enrollment Portal induced Plaintiffs to enter an Agreement that would give Defendants the means to interfere with Plaintiffs' student relationships and economic interests.  Further misrepresentations were made by Defendants in the form of repeated promises that the improper contacts would cease, when Defendants' behavior demonstrates it had no intention of ever keeping those promises.

211.    FuelEd/K12's intentional actions clearly interfered with Plaintiffs' economic relations with students and potential students, deprived UOS of enrollment, and thereby deprived UOS of funding that would offset the flat fee it paid to FuelEd/K12.

212.    FuelEd/K12's intentional actions have caused injury to UOS in the form of lost student enrollment:  High School students comprise the majority of UOS student enrollment, and because of the lack of a High School Enrollment Portal, not a single High School student was able to enroll with UOS.

213.    Moreover, the lost High School student enrollment decreases UOS's funding from the State, which funding would have served to offset (with Utah taxpayer dollars) the flat-fee paid by the District to FuelEd/K12 for the licenses Defendants prevented Plaintiffs from using.

### SEVENTH CAUSE OF ACTION
### (Unjust Enrichment)

214.    Plaintiffs incorporate Paragraphs 1-213 as if fully set forth herein.

215.    Unjust enrichment exists where (1) a benefit is conferred by one party upon another; (2) there exists an appreciation or knowledge by the conferee of the benefit; and (3) the

acceptance or retention of the benefit under such circumstances would make it inequitable for the conferee to retain the benefit without payment of its value. *Prudential Insurance Company of America v. Sagers*, 421 F.Supp.3d 1199, 1210 (D. Utah 2019).

216. UOS conferred a benefit upon FuelEd by entering the Agreement and remitting the full contract price for 2019-2020 in exchange for FuelEd/K12's promise of service to UOS students and to create a High School Enrollment Portal through which UOS's large High School population could enroll with UOS.

217. FuelEd/K12 have full knowledge of the benefit conferred upon them by UOS, by virtue of the existence of the Agreement and as evidenced by the ongoing communication relating to FuelEd/K12's poor performance or failure to perform thereunder.

218. It would be inequitable for FuelEd to retain the benefit of UOS's payment considering their numerous breaches of the Agreement, including their failure to create a High School Enrollment Portal.

219. FuelEd's failure to create the High School Enrollment portal rendered UOS unable to enroll a single High School student under the Agreement; UOS has had to retain and pay a separate third party to obtain the same benefit for which it has already paid FuelEd.

220. It would also be inequitable for FuelEd/K12 to retain the benefit of UOS's payment in light of FuelEd/K12's underlying business model: obtain private Minor Student information as a result of entering the flat-fee Agreement and then use that information to deprive UOS of student enrollment by intercepting students who begin the enrollment process and driving those students toward K12's own competing service, UTVA.

221.    As a result of the above, FuelEd has been unjustly enriched and should remit all payments made to it by Plaintiffs under the terms of the Agreement.

## EIGHTH CAUSE OF ACTION
### (Declaratory Judgment)

222.    Plaintiffs incorporate Paragraphs 1-221 as if fully set forth herein.

223.    A dispute has arisen between Plaintiffs and Defendants regarding the enforceability of the Agreement.

224.    Pursuant to Federal Rule of Civil Procedure 57 and 28 U.S.C. § 2201, "any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought."

225.    Defendants claim that the Agreement has not been breached, cannot be terminated, and remains in full force and effect.

226.    Plaintiffs have notified Defendants of numerous material breaches of the Agreement and have terminated the Agreement pursuant to its terms.

227.    Plaintiffs are entitled to a declaratory judgment that (1) the Agreement is terminated and of no effect; and (2) Plaintiffs are entitled to a full refund of all monies paid to Defendants under the terms of the Agreement.

228.    Consequently, there is an actual controversy regarding whether the Agreement is terminated that would be settled by a declaratory judgment that the Agreement is terminated and that the monies paid by UOS to Defendants should be remitted back to Plaintiffs.

229.    A declaratory judgment would clarify the legal relations at issue by determining whether adherence to the Agreement is still proper and whether damages are owed to Plaintiffs.

230.    Moreover, a declaratory judgment would terminate the Agreement and give relief from the insecurity that is currently enflaming the controversy between the parties.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment against Defendants as follows:

1.    On Plaintiffs' FIRST CAUSE OF ACTION, a finding that Section 5, Hosting Solution, is a material provision of the Agreement that has been breached and not cured by Defendants in a manner that has harmed Plaintiffs and that the Agreement is terminated;

2.    On Plaintiffs' SECOND CAUSE OF ACTION, a finding that the FERPA Provision of the Agreement is a material provision that has been breached and not cured by Defendants in a manner that has harmed Plaintiffs and that the Agreement is terminated;

3.    On Plaintiffs' THIRD CAUSE OF ACTION, a finding that the Warranty Provision of the Agreement is a material provision that has been breached and not cured by Defendants in a manner that has harmed Plaintiffs and that the Agreement is terminated;

4.    On Plaintiffs' FOURTH CAUSE OF ACTION, a finding that the totality of Defendants' actions constitute a material breach of the Agreement in a manner that has harmed Plaintiffs, that Defendants have not cured these breaches, and that the Agreement is terminated;

5.    On Plaintiffs' FIFTH CAUSE OF ACTION, a finding that Defendants have breached their implied covenant of good faith and fair dealing in a manner that has harmed Plaintiffs;

6.    On Plaintiffs' SIXTH CAUSE OF ACTION, a finding that Defendants intentionally interfered with Plaintiffs' existing or potential contractual relations, by improper means, causing injury to Plaintiffs;

7.      On Plaintiffs' SEVENTH CAUSE OF ACTION, a finding that Defendants have been unjustly enriched as a result of their actions as alleged herein and that Defendants should remit all payments made to it by Plaintiffs under the terms of the Agreement;

8.      On Plaintiffs' EIGHTH CAUSE OF ACTION, a declaration that the Agreement is terminated, and that Plaintiffs are entitled to a full refund of all monies paid to Defendants under the terms of the Agreement;

9.      Any further relief the Court deems just and proper.


Dated this 23 day of April, 2020.


/s/ Ginger Utley
Ginger Utley
Mitchell S. Maio
*Attorneys for Plaintiffs*